# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ROBERT E. MOECKEL, individually and    )
on behalf of the John Morrell Employee    )
Benefits Plan, similarly situated Plans, and    )
other participants and beneficiaries similarly    )
situated,    )
    )
        Plaintiff,    )
    )
v.    )     **Case No. 3:04-0633**
    )     **Judge Trauger**
CAREMARK, INC.,    )
    )
        Defendant.    )

## MEMORANDUM

Pending before the court are cross-motions for partial summary judgment (Docket Nos. 120 and 128), to which responses and replies have been filed (Docket Nos. 139, 142, 159, 164). The plaintiff has requested a hearing on his motion. (Docket No. 121) The plaintiff has also asked to unseal his memorandum of law filed in support of his summary judgment motion or to refile the brief in the public record with redaction. (Docket No. 134).

## I.  Introduction

Plaintiff Robert E. Moeckel, an employee of John Morrell & Co. ("Morrell & Co."), brought suit against Caremark, Inc. ("Caremark") and its parent company Caremark Rx, Inc. for breach of fiduciary duties under 29 U.S.C. § 1106(b) of the Employee Retirement Income Security Act of 1974 ("ERISA"). The plaintiff was a participant in and beneficiary of the John Morrell Employee Benefits Plan ("the John Morrell Plan" or "the JM Plan"), a prescription drug

1

plan funded by contributions by the plan sponsors as well as co-insurance, deductibles, co-payments, and other contributions made by the plaintiff and other plan participants and beneficiaries.

John Morrell Plan's prescription drug benefits were administered by defendant Caremark, a pharmacy benefits manager ("PBM").[1]   According to the plaintiff, Caremark's

---

[1]"Pharmacy benefit management companies, also known as pharmacy benefit managers (PBMs), play significant roles in both the nation's healthcare delivery system and the health insurance industry."   Mark K. Fendler, *Prescription or Proscription?  The General Failure of Attempts to Litigate and Legislate Against PBMs as "Fiduciaries," and the Role of Market Forces Allowing PBMs to Contain Private-Sector Prescription Drug Prices*, 40 J. Health L. 205, 207 (Spring 2007).   "Many health benefit plan sponsors offer their plan members, or beneficiaries, prescription drug insurance coverage along with the more traditional medical insurance coverage. Similar to how  they often engage third party administrators (TPAs) to administer plans' medical insurance claims, the plan sponsors also engage PBMs to manage their pharmacy insurance claims. Plan sponsors typically contract with PBMs to provide prescription drug benefit administration and management services.  The provisions of these contracts govern the terms of the relationship between the PBM and the plan sponsor." *Id.* at 210.  Approximately forty to fifty PBMs operated in the United States according to data available in 2004-05, but just three of those PBMs managed approximately one-third of all prescription drug spending in 2004. *Id.* at 212 n.20.

In 2005, the First Circuit Court of Appeals provided an informative overview of PBMs and their role in the American health care system:

> PBMs are major players in the delivery of health care in the United States. They act as middlemen in the lucrative business of providing prescription drugs. They serve as intermediaries between pharmaceutical manufacturers and pharmacies on the one hand (as the district court noted, the "supply" side of the trade) and health benefit providers (e.g., insurers, self-insured entities, health maintenance organizations, and public and private health plans) on the other (the "demand" side). The services that PBMs extend are designed to facilitate the provision of prescription drug benefits to the people who utilize the services of the health benefit providers.

> For example, PBMs often provide health benefit providers with access to an established network of pharmacies, where customers of the health benefit providers can obtain drugs at certain set prices. PBMs negotiate volume discounts and rebates with drug manufacturers by pooling substantial numbers of health benefit providers. This pooling gives the PBMs tremendous market power to demand concessions from the manufacturers. PBMs also provide drug utilization review services and "therapeutic interchange

2

provision of PBM services pursuant to its contracts with Morrell & Co. rendered Caremark a

fiduciary under ERISA.  More specifically, Moeckel claims that Caremark exercised discretion

or control over the pricing of prescription drugs through its control over the terms of its contracts

with its network of retail pharmacies (which control the reimbursement rates for retail drugs) and

with drug manufacturers (which control the actual cost of drugs dispensed through Caremark's

mail order pharmacies).  The plaintiff alleges that Caremark manipulated the terms of its

undisclosed contracts by creating hidden "pricing spreads" that yielded significant revenue to

Caremark that it failed to pass through to the plans.  By failing to disclose to the plans the

discounted price it paid for drugs purchased by the plans' participants and beneficiaries at retail

pharmacies, Caremark  allegedly was able to conceal from the plans the fact that Caremark

secretly exercised its discretion to create a "spread" between the discounted price that Caremark

paid retail pharmacies and the discounted price that Caremark contracted to be reimbursed by the

plans, a "spread" it retained.  Similarly, by buying drugs from drug manufacturers to stock mail-

order pharmacies, through which Caremark sold prescriptions to participants and beneficiaries,

---

programs" (in other words, substituting a drug for the one actually
prescribed by a doctor).

     In this role as intermediary, however, PBMs have the
opportunity to engage in activities that may benefit the drug
manufacturers and PBMs financially to the detriment of the health
benefit providers. For example, in cases of "therapeutic interchange,"
a PBM may substitute a more expensive brand name drug for an
equally effective and cheaper generic drug. This is done so that the
PBM can collect a fee from the manufacturer for helping to increase
the manufacturer's market share within a certain drug category.
Similarly, a PBM might receive a discount from a manufacturer on
a particular drug but not pass any of it on to the health benefit
provider, keeping the difference for itself.

*Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005), *cert. denied*, 126 S. Ct. 2360
(2006).

3

Caremark allegedly arranged significant discounts on those drugs but created a "spread" (which it retained) between the prices that Caremark agreed to pay the manufacturers and the prices that Caremark contracted to be reimbursed by the plans.

Moeckel also contends that Caremark contracted with drug manufacturers in ways that enriched Caremark to the detriment of the plans. Plaintiff alleges that Caremark was delegated discretionary control and authority to decide which manufacturers' drugs would be included in its formularies, including which would be included in its standardized formulary,[2] which drugs on the formularies would be "preferred," and which relative cost indicators would be placed next to each included drug. The plaintiff also alleges that Caremark was delegated discretionary authority and control to create "formulary compliance programs," or drug-switching programs, which enabled Caremark to switch plan participants and beneficiaries from higher-cost therapeutically equivalent drugs to lower-cost therapeutically equivalent drugs. The plaintiff alleges that Caremark used the market power it gained from this level of control to enrich itself at the expense of the plans, by negotiating with manufacturers to favor more expensive therapeutically equivalent drugs, which increased the plans' costs, in exchange for monies which Caremark retains and did not pass on to the plans.

Having negotiated with a plan or a plan's sponsor to share some of the rebates or other compensation, the plaintiff alleges that Caremark also engaged in self-dealing by characterizing (and sometimes intentionally mischaracterizing) payments, credits, or other compensation in ways to maximize its own profit at the expense of the plans. Moeckel also alleges that Caremark

---

[2]A formulary is a list of preferred brand-name drugs that limits the number of drugs available within a therapeutic class for purposes of drug purchasing, dispensing, and/or reimbursement. U.S. Department of Health and Human Services, Glossary of Pharmacy-Related Terms at http://www.hrsa.gov/opa/glossary.htm.

4

generated and retained interest on the "float" prior to disbursement of any rebates to the plans. In addition, the plaintiff alleges that Caremark violated its fiduciary duties by secretly and subversively conspiring with drug manufacturers to inflate the average wholesale price of prescription drugs, thereby evading the "best pricing" statute, the Omnibus Budge and Reconciliation Act, 42 U.S.C. § 1396r-8.

## II. Procedural History

Plaintiff Moeckel filed this case on July 19, 2004 as a putative class action on behalf of the John Morrell Plan and all other similarly situated self-funded prescription drug plans utilizing the services of defendants Caremark Rx Inc. and Caremark Inc. The plaintiff's original complaint was superseded by the amended complaint, filed November 9, 2004. (Docket No. 44). In it, plaintiff asserted multiple counts against Caremark Rx Inc. and/or Caremark Inc. under ERISA, 29 U.S.C. § 1001 *et seq.*, bringing claims in his capacity as a participant in the John Morrell Plan, on behalf of the John Morrell Plan under Section 502(a)(2) and/or 502(a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(2) and (a)(3), and on his own behalf and on behalf of other participants in, and/or beneficiaries of, the John Morrell Plan and other prescription drug plans administered by Caremark who made percentage copayments when purchasing prescription drugs, under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). The plaintiff alleges that the defendants, whom the plaintiff asserts were fiduciaries within the meaning of ERISA, violated ERISA in the following ways: (1) Count I - breach of fiduciary duty under 29 U.S.C. § 1104; (2) Count II - breach of fiduciary duty under 29 U.S.C. § 1106(b)(1); (3) Count III - breach of fiduciary duty under 29 U.S.C. § 1106(b)(2); (4) Count IV - breach of fiduciary duty under 29 U.S.C. § 1106(b)(3); (5) Count V - breach of the duty of care under 29 U.S.C. § 1104(a)(1)(B);

5

(6) Count VI - a cause of action for appropriate equitable relief from Caremark as a "party-in-interest" pursuant to 29 U.S.C. § 1106(A)(1)(D) and § 1132(a)(3); and (7) Count VII - an accounting of the amount of plan assets Caremark retained for its own benefit (and to the detriment of the plans) and of the profits earned by Caremark through its unlawful activities.

The defendants first moved to dismiss the plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction due to lack of standing or pursuant to Rule 12(b)(6) for failure to state a claim. (Docket No. 45). Alternatively, the defendants moved to transfer this case to the Northern District of Alabama pursuant to 28 U.S.C. § 1404(a). (*Id.*)

On August 29, 2005, the court granted in part and denied in part the defendants' motion. (Docket Nos. 69 and 70). The court granted the motion to the extent that the defendant Caremark Rx Inc. was dismissed as a party to this action. (*Id.*) The court denied the motion in all other respects. (*Id.*) With regard to venue, the court found that Caremark had failed to meet its burden of convincing the court that a transfer of venue to the Northern District of Alabama would serve the convenience of the parties and witnesses and the interests of justice. (Docket No. 69 at 30-32). After the court's decision, Caremark filed a motion to certify interlocutory appeal, to amend order, and to stay the case pending appeal. (Docket No. 71). The court denied the motion in all respects. (Docket No. 74).

The defendants subsequently moved to transfer this case to the Northern District of Illinois pursuant to 28 U.S.C. §§ 1404(a) and 1406(a). (Docket No. 82). The court denied the motion under both statutes, finding that Caremark had not persuaded the court that venue in this judicial district was improper or that the plaintiff's choice of forum should be upset. (*Id.*)

6

On April 17, 2006, the plaintiff filed a motion to compel Caremark to produce information and documents regarding Caremark's contracts with a "sample group" of members of the proposed class of ERISA plans; the number of "Caremark Clients," as defined by the plaintiff, on the first day of each of Caremark's fiscal years at issue; electronic billing data; pricing lists; pharmacy remittance data; rebates and other compensation received by Caremark from drug manufacturers; Caremark's revenue and profits related to the John Morrell Plan; and Caremark's policies, procedures, and protocols for certain conduct. (Docket No. 92). The parties jointly requested oral argument on the pending motion (Docket No. 94), which the court granted (Docket No. 98). The court heard oral argument on the plaintiff's motion on May 15, 2006, after which the court decided to hold in abeyance the plaintiff's motion pending the filing of a dispositive motion on the issue of whether Caremark, Inc. is a fiduciary with reference to the John Morrell Plan. (Docket No. 101). The court ordered that discovery proceed only on the fiduciary duty issue. (*Id.*) The court also postponed all rulings as to class certification pending the resolution of the fiduciary duty issue. (*Id.*)("I see this as a threshold issue whether they had a fiduciary duty at all . . . . All of your case depends on their being a fiduciary.")(Hearing Transcript Part 1 at p.8, Ex. 1 to Docket No. 130). The court allowed the plaintiff to depose the Caremark representatives he believed were necessary to properly understand the PBM Agreements and the relationship between Caremark and Morrell & Co. The plaintiff has had the opportunity to take those depositions.

The parties have now filed cross-motions for partial summary judgment on the issue of Caremark's fiduciary status under ERISA. The plaintiff claims that Caremark acted as a

fiduciary under ERISA when performing the following five distinct acts of ERISA plan management: (1) Caremark, in its sole discretion, set the price the John Morrell Plan paid for generic prescriptions; (2) Caremark, in its sole discretion, selected the benchmark average wholesale price ("AWP") reporting source that Caremark used to set the price the John Morrell Plan paid for brand-name prescriptions; (3) Caremark, in its sole discretion, determined whether a particular prescription would be adjudicated and priced as a brand-name or generic prescription; (4) Caremark, in its sole discretion, decided when it would dispense a brand-name drug as a generic prescription at its mail order facilities; and (5) Caremark, in its sole discretion, managed the formulary that defined the scope of the John Morrell Plan's prescription drug benefit and decided which member prescriptions to switch to a formulary-preferred prescription. (Docket No. 123 at 2).

In response, Caremark contends that the activities identified by the plaintiff relate to the basic administration of Caremark's own business, which is non-fiduciary in nature. Likewise, Caremark contends, Morrell & Co.'s contracting decisions as to what, and how, to pay Caremark for the services under the PBM Agreements, as well as what formulary(ies) and drug interchange programs to adopt for its plan, relate to plan design decisions, which are non-fiduciary in nature. According to Caremark, Morrell & Co. retained exclusive control, and all discretionary authority, over the management and administration of the JM Plan at all times; thus, the plaintiff cannot show that Caremark exercised discretion over the management and administration of the JM Plan.

In its motion for partial summary judgment, defendant Caremark contends that the undisputed facts show that (1) Caremark was not named as a fiduciary to the John Morrell Plan

in any of the PBM Agreements between Caremark and Morrell & Co.; and (2) Caremark did not exercise discretionary authority or control over management of the John Morrell Plan, or control over plan assets, and therefore, cannot be deemed a functional fiduciary under ERISA. Caremark seeks a ruling from the court that Caremark is not a fiduciary to the John Morrell Plan under ERISA. (Docket No. 128). Both parties agree that the issue of whether Caremark breached fiduciary duties, if it had such duties, is a separate question that remains to be addressed at a later time.

The plaintiff requests a hearing on his motion (Docket No. 121). The pertinent issues have been fully briefed by the parties. Therefore, the court finds that a hearing is unnecessary to the court's resolution of the pending motions.

The plaintiff also asks the court to unseal his memorandum filed in support of his motion for partial summary judgment or to permit the plaintiff to refile the memorandum in the public record with redaction of the pricing figures. (Docket No. 134). Caremark did not oppose the plaintiff's motion. Because Caremark's own brief was not filed under seal, but with a redaction of the pricing figures, the court finds that unsealing the plaintiff's brief would not prejudice Caremark. Therefore, the plaintiff's motion will be granted, and the plaintiff may refile the brief in the public record with a redaction of the pricing figures.

### III.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as

9

to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.,* 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC,* 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.,* 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.,* 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.,* 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson,* 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson,* 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White,* 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson,* 477 U.S. at

10

247-49).

When the party bearing the burden of persuasion at trial moves for summary judgment, it faces a "substantially higher hurdle," and must show that the evidence is so powerful than its entitlement to summary judgment is "beyond a reasonable doubt." *Cockrel v. Shelby Country Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).

## IV.   Factual Background[3]

### A.      The Business of Caremark

Caremark provides PBM services to sponsors of health benefit plans.  Caremark's customers are private employers, unions, government employee groups, insurance companies and managed care organizations.  Caremark enters into contracts with its customers, generally referred to as PBM Agreements. Under these PBM Agreements, Caremark undertakes to administer the pharmacy benefit component of the applicable health benefit plan in accordance with the plan design features adopted by the plan sponsor. Caremark is not the insurer or sponsor of the plan.

### B.      Morrell & Co. and the JM Plan

John Morrell & Company ("Morrell & Co.") is a meat manufacturing company employing 6700 men and women throughout the United States at facilities located in California, Iowa, Kansas, Kentucky, Ohio, and South Dakota.   Morrell & Co. sponsors four health benefit

---

[3]The facts are taken from the parties' proposed statements of undisputed fact and responses thereto, as well as from other evidence submitted by the parties in support of their cross-motions for partial summary judgment.  All facts are undisputed unless otherwise noted.  The court recognizes that many documents in this case were filed under seal, and the court has referenced or excerpted only those documents to the extent that the parties have done so.

11

plans (Hourly/Active, Hourly/Retirees, Salary/Active, and Salary/Retirees) for its employees and retirees.   As the plan sponsor, Morrell & Co. is responsible for designing the benefit plans it offers to its employees.  The plans are administered by Morrell & Co.'s benefits committee, which handles plan changes, amendments, and second level appeals.  Morrell & Co.'s corporate director of benefits, Wayne Ure, who also serves on the benefits committee, makes recommendations to the committee and handles first level appeals.

At all relevant times, Morrell & Co. provided prescription drug benefits to its employees and their dependents by establishing, maintaining, and funding a self-funded ERISA benefit plan.  Morrell & Co. paid the cost of each prescription claim covered by the JM Plan on a claim-by-claim basis, using its own assets.  Like most ERISA plans, the JM Plan required plan members to cover a portion of the prescription drug cost in the form of a copayment.  Plan members make their copayments out of their own pockets at the time they receive their prescriptions.

From 1997 to 2006, Caremark provided PBM services to Morrell & Co. and its self-funded ERISA plan.

### C. The 1997 PBM Agreement Between Caremark and Morrell & Co.

Caremark and Morrell & Co. entered into a contract in 1997 for Caremark to provide PBM services to the JM Plan.   The contract was signed by both parties with an effective date of January 1, 1997.  The language and legal terms of the 1997 contract expired on December 31, 2006.

Morrell & Co. contracted to have Caremark provide specific administrative services under the 1997 PBM Agreement, such as processing claims, filling prescriptions, computerized

drug interaction monitoring, customer service, distributing explanation of benefits letters, and providing access to its mail service pharmacy and network of retail pharmacies. Pursuant to the contract, Caremark was only to provide its services in the manner directed by Morrell & Co. and "in accordance with the Plan design features communicated by Client [Morrell & Co.] to Caremark." (Docket No. 129-3, 1997 PBM Agreement ¶ 2)(hereinafter "1997 PBM Agreement"). The 1997 PBM Agreement between Morrell & Co. and Caremark explicitly stated that Morrell & Co. would retain "sole authority to control and administer the Plan." (1997 PBM Agreement ¶ 4.b). The agreement provided that Morrell & Co. would have "the sole right to resolve disputed claims . . ." (1997 PBM Agreement ¶ 4.b). It also provided: "Nothing in this Agreement shall be deemed to confer upon Caremark the status of fiduciary as defined in the Employee Retirement Income Security Act of 1974, as amended, or any responsibility for the terms or validity of the Plan." (1997 PBM Agreement ¶ 4.b).

According to Caremark, it purchased drugs from mail order pharmacies and paid its retail pharmacy suppliers for drugs dispensed to plan members with its own funds, and then sent invoices to Morrell & Co. for prescriptions filled by JM participants. (Docket No. 129-2, Ure Deposition Part 2 at 224-25)(hereinafter "Ure Dep."). Caremark was at risk and had the sole contractual responsibility to pay the retail pharmacies in its network (along with the rest of its suppliers) and was obligated to make such payments irrespective of whether Caremark itself was paid by its customers, such as Morrell & Co. Caremark admitted it had the ability, in its discretion, to time payment such that it paid the pharmacy after it received payment from Morrell & Co. (Docket No. 129-6, Saban Deposition Part 2 at 77)(hereinafter "Saban Dep."). Based on invoices sent by Caremark, Morrell & Co. paid Caremark for the prescriptions on a periodic basis.

The language of the 1997 PBM Agreement provides as follows:

> For each Prescription billed to Client . . . Client shall pay Caremark the current negotiated rate in effect with the dispensing retail pharmacy, less the Covered Member copayment as established by the Client. The total net effective rate for all prescriptions . . . (excluding South Dakota pharmacies) shall be AWP less XX% for brand-name drugs or the Maximum Allowable Cost as published from time to time by the Health Care Finance Administration, as expanded by Caremark, for generic substitutes . . . .

(1997 PBM Agreement, Ex. A-1, ¶ 2).[4] Citing this language, Caremark and Morrell & Co. agree that Morrell & Co. had pass-through pricing at least from 1997 to 1999. Indeed, Caremark witness Greg Madsen testified that the "net effective rate" language required Caremark to pass through to Morrell & Co. any retail pharmacy discounts it obtained. (Docket No. 129-8, Madsen Dep. at 89-90). "Pass-through" pricing provided that, for a drug dispensed at a retail pharmacy, Caremark would charge Morrell & Co. the same price that the retail pharmacy charged Caremark for that drug.

Under the 1997 PBM Agreement, Caremark also agreed to pay Morrell & Co. a fixed annual rebate or credit for each brand-name prescription dispensed to JM Plan participants.

### D.   *The Proposed 2000 PBM Agreement Between Caremark and Morrell & Co.*

Caremark contends that the parties renewed their relationship in 2000 by way of a PBM agreement dated January 1, 2000. The Morrell & Co. corporate benefit director testified that the 1997 PBM Agreement "remained in place for those three years from 1997 through 2000" and that it was "fair to say" that the 2000 contract was the effective contract in place after 2000.

---

[4]The parties redacted the pricing figures from their briefs since that information is confidential and proprietary. The exact pricing figures are not relevant to the court's disposition of the pending motions.

(Ure Dep. Part 1 at 173, 185-86).  Laura Kuchta testified that it "absolutely" was "Caremark's intent that the January 1, 2000, proposed contract . . . was to go into effect on January 1, 2000, including its terms" and would replace the terms of the 1997 contract.  (Docket No. 129-5, Kuchta Dep. at 147-48).

The Proposed 2000 PBM Agreement, like the 1997 PBM Agreement, provided: "Nothing in this Agreement shall be deemed to confer upon Caremark the status of fiduciary as defined in the Employee Retirement Income Security Act of 1974, as amended, or any responsibility for the terms or validity of the Plan."  (Docket No. 129-4, 2000 Proposed PBM Agreement ¶ 4.b)(hereinafter "2000 Proposed PBM Agreement").  Similarly, it contained the same language that Morrell & Co. would retain "sole authority to control and administer the Plan." (2000 Proposed PBM Agreement ¶ 4.b.) and that Caremark would provide services to the JM Plan-- such as claims processing, filling prescriptions, computerized drug interaction monitoring, customer service, distributing explanation of benefits letters, and access to its mail service pharmacy and network of retail pharmacies--"in accordance with the Plan design features communicated by Client [Morrell & Co.] to Caremark."  (2000 Proposed PBM Agreement ¶ 2.). The 2000 Agreement also included the language that Morrell & Co. would have "the sole right to resolve disputed claims . . ." (2000 Proposed PBM Agreement ¶ 4.b.).

Caremark alleges that in 2000, by way of the new PBM Agreement, the parties negotiated for guaranteed pricing for drugs dispensed at retail instead of "pass-through" pricing. According to Caremark, the guaranteed price that Morrell & Co. negotiated to pay starting in 2000 was not dependent on the price that Caremark paid to retail pharmacies.  As Caremark explains it, Caremark agreed to bear the risk of the various price fluctuations charged by the individual pharmacies, if any, while Morrell & Co. agreed to pay Caremark a fixed price

15

discount regardless of such fluctuations; thus, the guaranteed pricing gave Morrell & Co.

uniform and predictable pricing on every transaction.

The pertinent contract language is as follows:

> For each Prescription . . . dispensed . . . through Caremark's retail
> pharmacy network (excluding South Dakota pharmacies), Client
> shall pay Caremark AWP less XX% for brand-name drugs [and
> AWP less XX% for prescriptions dispensed through Caremark's
> retail pharmacy network located in the state of South Dakota] or
> the Maximum Allowable Cost as determined from time to time by
> Caremark for generic substitutes . . .

(2000 Proposed PBM Agreement, Ex. A-1, ¶ 2).

The plaintiff disputes that the "pass-through" pricing in the 1997 contract was altered or

replaced by the proposed 2000 contract. The plaintiff maintains that the 1997 PBM Agreement

was the only executed contract between Caremark and Morrell & Co, and the plaintiff

"emphatically denies that the unsigned 2000 management Contract replaced the 1997

Management Contract." (Docket No. 123 at 14). In support of his contention, the plaintiff

points to the testimony of James Hogan, a national account executive for Caremark responsible

for managing the day-to-day servicing of the Morrell & Co. account, who stated that the 1997

PBM contract remained in effect from 1997 to the date of his declaration, which was September

9, 2004. (Docket No. 125-4, Hogan Decl. ¶ 5). Mr. Hogan has never recanted this testimony.

The 2000 Proposed PBM Agreement also provides Morrell & Co. with a higher fixed

annual rebate or credit for each formulary brand-name prescription dispensed to JM Plan

participants. This annual rebate was not related to or dependent upon rebates that Caremark

received from drug manufacturers. Rather, Caremark paid the credit to Morrell & Co. with its

own funds based on the per prescription rate Morrell & Co. negotiated with Caremark in the

16

contract.

### E. Subsequent PBM Agreements Between Caremark and Morrell & Co.

Morrell & Co. negotiated even better pricing terms with Caremark in 2003. Morrell & Co. was able to obtain a greater increase in the rebate credit. Morrell & Co. did not renew its contract with Caremark which expired on December 31, 2006, thereafter consolidating the prescription drug benefit provided by the JM Plan with that of its parent company, SmithfieldFoods. Accordingly, effective January 1, 2007, Caremark no longer provided PBM services to Morrell & Co.

## V. Applicable Law

The central issue before the court is whether Caremark was a fiduciary as that term is defined in the statute and whether Caremark was acting in its capacity as a fiduciary at the time it took the actions that are the subject of the complaint. *See* 29 U.S.C. §§ 1002(21)(A), 1106(b); *Pegram v. Herdich*, 530 U.S. 211, 223-226 (2000).

A person is a fiduciary for an ERISA plan "to the extent (i) he exercises any discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A), *Pegram*, 520 U.S. at 223. "ERISA also defines a 'person' to include a corporation." *Hamilton v. Carell*, 243 F.3d 992, 998 (6th Cir. 2001).

ERISA provides that "not only the persons named as fiduciaries by a benefit plan, *see* 29 U.S.C. § 1102(a), but also anyone else who exercises discretionary control or authority over the

Case 3:04-cv-00633   Document 166   Filed 11/13/07   Page 17 of 51 PageID #: 2456

plan's management, administration, or assets, *see* § 1002(21)(A), is an ERISA 'fiduciary.' "

*Mertens v. Hewitt Assocs*., 508 U.S. 248, 262 (1993). Thus, ERISA defines "fiduciary" "not in

terms of formal trusteeship, but in *functional* terms of control and authority over the plan, thus

expanding the universe of persons subject to fiduciary duties...." *Mertens,* 508 U.S. at 262

(emphasis in original and internal citation omitted); *see also Smith v. Provident Bank,* 170 F.3d

609, 613 (6th Cir. 1999)("[T]he definition of a fiduciary under ERISA is a functional one, is

intended to be broader than the common law definition, and does not turn on formal designations

such as who is the trustee."); *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006)("This court

employs a functional test to determine fiduciary status.").

Courts "examine the conduct at issue to determine whether it constitutes 'management'

or 'administration' of the plan, giving rise to fiduciary duties, or merely a business decision that

has an effect on an ERISA plan not subject to fiduciary standards." *Seaway Food Town, Inc. v.

Med. Mut. of Oh.,* 347 F.3d 610, 617 (6th Cir. 2003) (quoting *Hunter v. Caliber Sys., Inc.,* 220

F.3d 702, 718 (6th Cir. 2000)). Courts must also consider whether a person was acting as a

fiduciary when taking the actions alleged in the complaint, since not all actions by persons who

might be fiduciaries will be undertaken in relation to a plan. *Seaway,* 347 F.3d at 617 (citing

*Pegram v. Herdrich,* 530 U.S. 211, 226 (2000)).

As recognized previously by the court, there can be no dispute that Caremark is not a

"named fiduciary" under the JM Plan, since the PBM Agreements specifically state:

> Client shall have sole authority to control and administer the Plan.
> *Nothing in this Agreement shall be deemed to confer upon
> Caremark the status of fiduciary as defined in the Employee
> Retirement Income Security Act of 1974, as amended,* or any
> responsibility for the terms or validity of the Plan. Client has the
> sole right to resolve disputed claims and shall promptly inform
> Caremark of such resolution.

(1997 and 2000 Proposed PBM Agreements ¶¶ 4.b.)(emphasis added).  Whether Caremark Inc. constitutes a "functional fiduciary," then, is the determinative question before the court.

The legal significance of being deemed an ERISA fiduciary relates to the legal requirements that ERISA imposes on fiduciaries.  ERISA requires that a fiduciary must act "solely in the interest of the participants and beneficiaries" of the plan.  29 U.S.C. § 1104(a)(1).  Additionally, ERISA prohibits certain conduct by fiduciaries which raises an inference that the fiduciary is not acting in the best interest of plan participants and beneficiaries, including transactions between a plan and a fiduciary in which the fiduciary deals in plan assets for his or her own account or acts on behalf of someone with interests adverse to the plan or its participants or beneficiaries.  *Id*. §§ 1106(b)(1)-(3).

An ERISA fiduciary who fails to live up to his or her legal duties or who violates any of ERISA's prohibitions faces broad legal liability:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

*Id*. § 1109(a).  ERISA's civil enforcement provisions authorize lawsuits against fiduciaries by the United States Secretary of Labor as well as by individual private plaintiffs.  29 U.S.C. § 1132(a)(2).

As noted by the First Circuit Court of Appeals, the "threshold question" of whether a PBM is acting as an ERISA fiduciary "is an issue with high stakes, for classification as a

fiduciary or a nonfiduciary renders a defendant liable for different types of damages." *Pharm.*
*Care Mgmt. Ass'n*, 429 F.3d at 300. Under sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§
1109(a), 1132(a)(2), an ERISA fiduciary is personally liable for monetary damages, for
restitution, and for "such other equitable or remedial relief as the court may deem appropriate."
A non-fiduciary, however, is not subject to monetary damages in a suit brought under ERISA.
*Id.*

## VI. Analysis

The PBM Agreements between Caremark and Morrell & Co. obligated Caremark to
provide a variety of services to the covered plan participants. For example, Caremark was
required to provide claims processing, fill prescriptions, provide computerized drug interaction
monitoring, provide customer service, distribute explanation of benefits letters, and provide
access to its mail service pharmacy and network of retail pharmacies. Both the 1997 PBM
Agreement and the Proposed 2000 PBM Agreement explicitly provided that Caremark was not a
fiduciary as that term is defined by ERISA and that Morrell & Co., the plan sponsor, possessed
the sole authority to control and administer the JM Plan.

Nevertheless, Plaintiff Moeckel contends that, for the relevant time period, Caremark had
discretionary authority over the management and administration of Morrell & Co.'s drug benefit
plan and exercised discretion and control over the JM Plan's assets. This discretionary authority,
says the plaintiff, gave rise to fiduciary duty under ERISA. In particular, the plaintiff contends
that Caremark acted as a fiduciary under ERISA when performing the following five distinct acts
of ERISA plan management: (1) Caremark, in its sole discretion, set the price the John Morrell
Plan paid for generic prescriptions; (2) Caremark, in its sole discretion, selected the benchmark
AWP reporting source that Caremark used to set the price the John Morrell Plan paid for brand-

name prescriptions; (3) Caremark, in its sole discretion, determined whether a particular prescription would be adjudicated and priced as a brand-name or generic prescription; (4) Caremark, in its sole discretion, decided when it would dispense a brand-name drug as a generic prescription at its mail order facilities; and (5) Caremark, in its sole discretion, managed the formulary that defined the scope of the John Morrell Plan's prescription drug benefit and decided which member prescriptions to switch to a formulary-preferred prescription. (Docket No. 20). According to the plaintiff, the discretionary authority Caremark retained and exercised with respect to each of these specific acts of plan management directly affected both the total cost of the prescription drug benefit and the copayment owed by the plan participant or beneficiary.

## A.    *Drug Prices*

   1.    *The plaintiff alleges that Caremark served as an ERISA fiduciary when it exercised discretion in setting the price the John Morrell Plan paid for generic prescriptions.*

      a.    **1997 PBM Agreement**[5]

The parties concur that, under the 1997 PBM Agreement, they agreed to pass-through pricing, meaning that, for any generic drug dispensed at retail, Morrell & Co. would pay Caremark the same price that Caremark was charged for that drug by the retail pharmacy that dispensed the product. (*See* 1997 PBM Agreement, Ex. A-1, ¶ 2)("For each Prescription . . .

---

[5]The plaintiff contends that the question of whether the Proposed 2000 PBM Agreement replaced the 1997 PBM Agreement does not need to be resolved at this time because this question goes to issues of fiduciary breach and damages, which are not presently before the court. (Docket No. 123 at 4 n.11). The court agrees that, for purposes of ruling on the pending cross-motions for partial summary judgment, the matter need not be resolved. Because the fact is disputed, the court will refer herein to the 2000 agreement as the "proposed" 2000 PBM agreement.

dispensed . . . through Caremark's retail pharmacy network, Client shall pay Caremark the current negotiated rate in effect with the dispensing retail pharmacy. . . ."). Thus, the parties contractually agreed on a set price for generic prescriptions that were dispensed to JM Plan members--the same price that Caremark was charged by the retail pharmacies, whatever that might be.[6]

Caremark did not have the discretion, as Moeckel alleges, to unilaterally set the price for generic prescriptions dispensed to JM Plan members. However, because the PBM agreement did not prohibit Caremark from negotiating with retail pharmacies in an effort to obtain a favorable price per prescription (a price which Caremark was then contractually obligated to pass along to Morrell & Co.), Caremark played a role in the determination of prescription prices. In the absence of evidence to the contrary, however, this role--Caremark's contracting with retail pharmacies in its proprietary network--is separate and distinct from Caremark's contractual relationship with Morrell & Co. or any of its other customers. It is part of Caremark's administration of its own business as a PBM. As such, it is not fiduciary in nature. *See Am. Drug Stores, Inc. v. Harvard Pilgrim Health Care, Inc.*, 973 F. Supp. 60, 67-68 (D. Mass. 1997)(finding that carrier's contracting with and organization of retail pharmacy networks is part of carrier's administration of its own business, not the administration of ERISA plans to whom it provides services); *Pipefitters Local 636 v. Blue Cross & Blue Shield of Mich.*, No. 05-2580, 2007 WL 128773, at *5 (6th Cir. Jan. 17, 2007)("Discretionary authority does not exist where a

_____

[6]If Morrell & Co. believed Caremark failed to pass through any savings it realized as a result of negotiations with retail pharmacies, then Morrell & Co. could have pursued a breach of contract claim against Caremark for violating its contractual obligation under the 1997 PBM Agreement to bill Morrell & Co. the same price per drug as retail pharmacies charged Caremark for the drug.

party . . . makes business decisions on its own behalf, outside of its role as plan administrator.").

### b. 2000 Proposed PBM Agreement

The Proposed 2000 PBM Agreement provided that the price for generic drugs dispensed at retail would be the "Maximum Allowable Cost as determined from time to time by Caremark." (2000 Proposed PBM Agreement, Ex. A-1). The plaintiff maintains that the 2000 PBM Agreement did not replace the 1997 PBM Agreement; however, even assuming that it did, the plaintiff contends that, through the phrase "as determined by Caremark," Caremark retained for itself the discretionary authority to manage and set the MAC price that the JM Plan paid for generic prescriptions dispensed to JM Plan members on any given day, and that that discretion gave rise to an ERISA fiduciary duty.

Morrell & Co. agreed to pay Caremark its MAC list prices for generics dispensed at retail. Mr. Ure testified that, in his capacity as Morrell & Co.'s director of employee benefits, he negotiated for "the Caremark MAC." (Ure Dep. Part 2 at 355). Morrell & Co.'s decision to enter into the PBM Agreement with Caremark, and to agree to the various terms contained therein, was a plan design decision, exempt from fiduciary review. Mr. Ure stated that he understood that the standard MAC list price approximated AWP minus XX percent, and, as reflected by the plain contract terms, was revised and updated on a regular basis, like any vendor's product price list. (Ure Dep. Part 2 at 250-52). Thus, while Morrell & Co. may now dislike the consequences of its agreement with Caremark, there can be no argument that Morrell & Co. did not understand the terms of the contract regarding MAC pricing at the time it entered

into the PBM agreement. As one court observed:

> [I]t strikes the court that the gravamen of Bickley's SAC is that
> Georgia-Pacific made a bad bargain with Caremark, that Caremark
> is amassing great wealth thereby, and that some or all of this
> wealth should be returned to Georgia-Pacific or its hourly
> employees in the form of lower Plan premiums and costs. The
> court, like any one who reads about business, is aware that
> business people make horrendously bad bargains from time to
> time, with the result that the other party to the contract reaps great
> rewards. Absent fraud or other statutory justification for
> avoidance of contract performance or imposition of ERISA status
> on Caremark, it is not the court's role to redraw contracts,
> particularly those made between entities such as Georgia-Pacific
> and Caremark, who both have the resources to negotiate terms
> deemed favorable to them.

*Bickley v. Caremark Rx, Inc.,* 361 F. Supp.2d 1317, 1334 (N.D. Ala. 2004). The arrangement

challenged by the plaintiff is the product of the agreement into which Morrell & Co. and

Caremark entered voluntarily. No fiduciary duty is implicated.

The plaintiff has adduced no evidence that Caremark exercised discretionary authority

over Morrell & Co.'s decision to enter into the contracts at issue or its decision to "negotiate[]

for the Caremark MAC." (Ure Dep. Part 2 at 355). *See Chicago Dist. Council of Carpenters*

*Welfare Fund v. Caremark, Inc.,* 474 F.3d 463, 473 (7th Cir. 2007)("Given that this scheme was

the very deal for which Carpenters bargained at arms' length, Caremark owed no fiduciary duty

in this regard."); *Trs. of Laborers' Local 72 v. Nationwide Life Ins. Co.*, 783 F. Supp. 899, 908

(D. N.J. 1992)(finding that insurer did not acquire fiduciary duties by entering into contract with

pension fund sponsor in which insurance company agreed to appoint itself as source of annuities

to be issued; "this was precisely what plaintiff bargained for and what the parties had agreed to

in the insurance Contract."); *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1132 (7th Cir.

1983)(finding that BC/BS was not a fiduciary under ERISA with respect to the selection of a hospital service organization and as to its compensation as a provider of plan benefits; "The responsibility for ensuring a prudent choice . . . rested upon the Trustees.").   Moreover, Morrell & Co.'s agreement to pay Caremark's list price did not give Caremark discretion over the Plan run and managed by its client, when its client explicitly retained sole and exclusive control over the Plan at all times.  (*See* 1997 PBM Agreement ¶ 4.b; 2000 PBM Agreement ¶ 4.b).

Unlike the 1997 PBM agreement, the proposed 2000 PBM agreement contained no mechanism for a pass-through of any additional savings Caremark might have negotiated with retailers.  As in *Carpenters*,  "The contracts did not provide, for example, that [the plan sponsor] would pay AWP minus the highest percent discount that Caremark could negotiate with retailers using its market power."  474 F.3d 463, 473.   "Without such a provision," said the Seventh Circuit,  "Caremark was free to negotiate with retailers to pay less than the amount Carpenters would later reimburse it, allowing Caremark to pocket the difference.  This, of course, is the very conduct that Carpenters alleges was a breach of fiduciary duty."  *Id*.

It is also the very conduct that Moeckel alleges was a breach of fiduciary duty.   This court agrees with the Seventh Circuit that, "[g]iven that this scheme was the very deal for which [the plan sponsors Carpenters and Morrell & Co.] bargained at arms' length, Caremark owed no fiduciary duty in this regard."  *Id*.; *see also Bickley*, 361 F. Supp.2d 1317, 1332 (finding that the theory advanced here "assumes rather than proves Bickley's fiduciary argument: that the monies Caremark makes from these discounts, rebates, coupons and the like, are Plan assets and as such, need to be disgorged back into the Plan.").

There is no requirement in the contract that Caremark negotiate retail pharmacy discounts for the benefit of or behalf of the JM Plan.  *See Carpenters*, 474 F.3d 463, 475 (7th Cir.

Case 3:04-cv-00633   Document 166   Filed 11/13/07   Page 25 of 51 PageID #: 2464

2007)("No provision in any of the contracts requires or authorizes Caremark to enter into agreements *on behalf of Carpenters* with the drug manufacturers.")(emphasis in original). The evidence cited by the plaintiff does not support the plaintiff's contention that "[d]uring depositions, Caremark's corporate witness conceded that this contract language required Caremark to negotiate retail pharmacy discounts for the benefit of the John Morrell Plan . . . ." (Docket No. 123 at 14). Joel Saban, Caremark's corporate witness, testified:

> Q.    With respect to the '97 contract . . . as well as the 2000 contract, do either of those contracts contain any provision hiring Caremark to go out and negotiate with drug manufacturers on the John Morrell plan's behalf?
> A.    No, they do not.
> Q.    Do the contracts have any provisions or terms with respect to how Caremark is supposed to go out and purchase drugs from its suppliers?
> A.    No, it does not. In fact, the contract is pretty straightforward on John Morrell's price, that they are buying the products from Caremark and what the price is for that service for that product.

(Docket No. 129-7, Saban Dep. at 276).[7] He further testified:

> Q.    So that the pricing terms in the Morrell contract pertain to John Morrell's relationship with Caremark; is that correct?
> A.    Yes.
> Q.    It does not pertain to any relationship or direction as to how Caremark is to acquire its products from manufacturers or other suppliers?
> A.    No, it does not.

(*Id.* at 277). Morrell & Co. corporate benefits director Mr. Ure similarly testified:

> Q.    And do you agree that none of your contracts with Caremark hired Caremark to go out and negotiate contracts on behalf of the John Morrell plan with any of the pharmaceutical manufacturers, correct?
> A.    We didn't explicitly hire them because they had -- they

---

[7]There were no objections to this testimony during Mr. Saban's deposition.

already negotiated a contract, and that's how they were able to
pass on the AWP and the MAC pricing to us.

Q.     So you never --

A.     We're the beneficiary of a contract that they held.

(Ure Dep. Part 2 at 225-26).[8]

As in the *Carpenters* case, here there is no provision in the PBM Agreements requiring or

even authorizing Caremark to negotiate with retail pharmacies on behalf of or for the benefit of

Morrell & Co., let alone the JM Plan.  Absent a provision in the governing documents requiring

or authorizing Caremark to negotiate with retail pharmacies on behalf of or for the benefit of

Morrell & Co. or to share the "spread" or other discounts, the court cannot impose a duty on

Caremark to so act.

The court therefore finds that Caremark's management of its own price list did not create

any fiduciary duty owed by Caremark to the JM Plan.  See 29 U.S.C. § 1002(21)(A) (discretion

must be "respecting management of [a] plan," or the administration of a plan or authority or

control over its assets); *see also Mulder v. PCS Health Sys., Inc.*, 432 F. Supp.2d 450, 460 (D.

N.J. 2006) ("Plaintiff assumes that [the PBM] had discretionary authority or exercised

discretionary authority with regard to the plan because [the PBM] acted as a middleman between

drug manufacturers and Oxford[, but] Plaintiff fails to show how [the PBM] had actual control or

_____

[8]Although Caremark objects to the plaintiff's reliance on Mr. Ure's testimony in support of arguments advanced in the plaintiff's partial summary judgment motion (*see* Docket No. 142 at 5-6), this particular  testimony (supporting Caremark's position) appears to have been elicited on cross-examination by Caremark's counsel, Mr. Frank Pasquesi.  (Docket No. 129-2, Ure Dep. at 223). Unfortunately, the deposition excerpts filed by the parties make it difficult for the court to ascertain who is asking the witness questions at any particular time.  However, because Mr. Ure referred to "Frank" in response to a question just two transcript pages prior to the cited testimony, and because the court reporter did not record any change in the attorney questioning the witness, the court surmises that defense counsel Pasquesi is still cross-examining Mr. Ure at this point.  In any event, the deposition transcript reflects that there were no objections by counsel to this particular testimony.

Case 3:04-cv-00633   Document 166   Filed 11/13/07   Page 27 of 51 PageID #: 2466

authority over the Oxford plan or plan assets. Plaintiff is, in essence, seeking relief for actions that [the PBM] took in accordance with the terms of its agreement with Oxford."); *Am. Drug Stores, Inc. v. Harvard Pilgrim Health Care, Inc.*, 973 F. Supp. 60, 67-68 (D. Mass. 1997)(emphasis in original)(holding that "the organization and offering of restricted pharmacy networks" was part of the carrier's administration of its own business and *not* the administration of the ERISA plans to whom it provided services, noting "it is critical to distinguish between the carrier's administration of the ERISA plan and '*its* own administration of its business.'").

**B.**     ***The plaintiff alleges that Caremark served as an ERISA fiduciary when selecting in its discretion the benchmark AWP reporting source Caremark used to set the price the John Morrell Plan paid for brand-name prescriptions.***

Under the PBM Agreement between Morrell & Co. and Caremark, the AWP was used as a benchmark from which the price of the drugs dispensed by Caremark to JM Plan participants was calculated and billed to Morrell & Co. (*See* 1997 PBM Agreement, Ex. A, ¶¶ 1 and 2). The 1997 PBM Agreement defined "AWP" as "the average wholesale price for a standard package size of a Prescription drug as established by First Data Bank or other nationally available reporting service of pharmaceutical prices." (1997 PBM Agreement ¶ 1). Caremark uses First Data Bank for determining AWP across its entire book of business (including with respect to Morrell & Co.) and has always done so.

The plaintiff alleges that Caremark exercised discretionary control and authority over the selection of the AWP reporting source by selecting and using First DataBank as the AWP reporting source for all clients and by deciding to keep First DataBank as Caremark's chosen AWP reporting source. Caremark retained the discretion to switch from First DataBank to another AWP reporting source without obtaining John Morrell's approval. According to the plaintiff, such exercise of discretion directly affected the cost of the prescription drug benefits

covered under the JM Plan.

First, Caremark's use of First DataBank as the AWP pricing source was in specific adherence to the terms of the contracts between Morrell & Co. and Caremark. It is axiomatic that adherence to existing contract terms precludes any finding of fiduciary status. *See Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 619 (6th Cir. 2003)(holding that party's adherence to a contract term does not give rise to fiduciary status). As the court in *Marks v. Independence Blue Cross*, 71 F. Supp.2d 432 (E.D. Pa. 1999), held with respect to ERISA claims asserted by a plan sponsor against IBC, a vendor to the plan:

> IBC proposed to plaintiffs terms under which it would provide medical insurance. The plaintiffs' Fund was free to reject those terms and purchase insurance from another provider. In fact, the Fund threatened to do so. The Fund was also free to request premiums lower than those suggested by IBC, and, again, did so. Succinctly put, contract negotiation is not discretionary plan administration.

*Id.* at 436. In *Marks*, the plaintiff plan sponsor alleged that IBC, the insurer that contracted to provide health benefits to the plan, breached fiduciary duties under ERISA by failing "to disclose or pass on the full benefits of all discounts that IBC was receiving from medical providers." *Id.* The court rejected this claim on the grounds that IBC was not a fiduciary when it negotiated contract terms. *Id.* Likewise, Morrell & Co.'s decision to negotiate contracts with Caremark that provided for Caremark's use of First DataBank as its AWP price source was a pre-contractual, and thus non-fiduciary, action by Morrell & Co. *See also Carpenters*, 474 F.3d at 473 ("Caremark was free to negotiate with [its suppliers] to pay less than the amount Carpenters would later reimburse it, allowing Caremark to pocket the difference.").

The contract language relied upon by the plaintiff is contained in the third-party service contracts between Caremark and Morrell & Co. The language is not within the JM Plan

29

documents.  *See Erlander v. Liberty Life Assurance Co. of Boston*, 320 F. Supp.2d 501, 509 (N.D. Tex. 2004)(finding that similar service contracts which were not provided to ERISA plan participants were not "a part of an ERISA plan"); *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 817 (7th Cir. 2002)(finding that similar service contracts between employer and claims administrator "not a 'plan document' for purposes of holding its terms against a plan participant or beneficiary").   Caremark's use of First DataBank as its AWP pricing source in accordance with such provisions is in connection with the administration of Caremark's own business and service contract, not the JM Plan.  *Id.*  Because the service contracts were with the plan sponsor and not the plan, absent other facts not present here, the court cannot accept the plaintiff's claim that Caremark was exercising any discretion over the Plan or the Plan's assets by using First DataBank as its AWP pricing source.  *See* 29 U.S.C. § 1002(21)(A) (discretion must be exercised "respecting management of [a] plan.").

Further, Caremark used First DataBank for determining AWP across its entire book of business, including with respect to Morrell & Co., and has always done so.  As such, Caremark could not have been exercising discretion over the JM Plan when it made the choice to use First DataBank as its AWP source before ever doing business with Morrell & Co.  *See* 29 U.S.C. § 1002(21)(A) .

C.    ***The plaintiff alleges that Caremark served as an ERISA fiduciary when it exercised discretion in determining whether to adjudicate and price a prescription as a brand-name or generic prescription.***

Caremark used the Medi-Span database across its entire book of business for determining whether a drug is brand or generic. (Saban Dep. at 353-56).  At no time during Caremark's relationship with Morrell & Co. did Caremark use any other database besides Medi-Span for determining whether a drug is brand or generic.

30

The plaintiff alleges that by selecting and staying with Medi-Span for all brand-generic determinations, Caremark exercised discretionary authority and control over the management of the JM Plan that triggers fiduciary status under ERISA. The plaintiff's allegation falls short. Caremark's use of Med-Span's electronic database in the course of its own business does not evidence the exercise of any discretion over the JM Plan because the PBM agreements were between Caremark and Morrell & Co -- not the JM Plan -- and the PBM agreements were not the JM Plan or the JM Plan documents. The plaintiff has not submitted evidence establishing that the JM Plan had a contractual relationship with Caremark. As the contracting party, Morrell & Co. -- the named fiduciary and plan administrator of the JM Plan-- was responsible for reviewing services provided. (*See* 1997 PBM Agreement ¶ 4.b; 2000 Proposed PBM Agreement ¶ 4.b). As with all of Moeckel's various allegations concerning pricing components of the agreements, if Morrell & Co. believed it was improperly charged, it could have taken whatever action it deemed necessary, including filing a lawsuit against Caremark.

**D.** *The plaintiff alleges that Caremark served as an ERISA fiduciary when it exercised discretion in determining when to dispense a brand drug as a generic prescription at Caremark's mail order facilities.*

The plaintiff's next theory is that, in certain limited situations, Caremark dispensed brand name drugs as the generic to fill a generic prescription presented, charging the participant the generic price and not providing Morrell & Co. with any "credit" under the contract; this practice, alleges the plaintiff, demonstrates that Caremark exercised ERISA fiduciary discretion with respect to the JM Plan.

As background, throughout its ten-year relationship with the JM Plan, Caremark was obligated to pay, as an "annual rebate," a set dollar credit for each brand-name prescription or formulary brand-name prescription that was dispensed to a member of the Plan.

Under the 1997 contract and proposed 2000 contract, Caremark was required to pay at the end of each year a set dollar amount as a credit for each brand-name prescription dispensed to a JM Plan member.  (1997 PBM Agreement Ex. B-1; 2000 Proposed PBM Agreement Ex. B-1).  Pursuant to the 1997 PBM Agreement, Caremark was required to pay a $XX credit for each mail service brand-name prescription and an $XX credit for each retail brand-name prescription.  Pursuant to the 2000 Proposed PBM Agreement, Caremark was required to pay a $XX credit for each mail service formulary brand-name prescription and $XX credit for each retail formulary brand-name prescription.  (*Id*.)  The credits were increased in 2003.

In certain limited situations, in accordance with the client's plan design and only where the participant was agreeable and the prescriber permitted, Caremark's mail order pharmacy dispensed a branded product as the generic so long as the generic was A-Rated to the brand (i.e., the same drug compound), allowing the participant to receive the brand product for the same price and co-pay as the generic equivalent.  (Docket No. 144-4, Aff. of Joel Saban ¶¶ 6,8).  When this occurred, the prescription was processed at the generic price, and the generic co-payment and reimbursement rate still applied as defined by the individual plan design.  Thus, there was no additional cost or financial impact to the participant or the client, such as Morrell & Co.  (*Id*. ¶ 9).

The dispensing of a brand name drug as the generic product is not a process internal to Caremark.  Rather, it is an industry practice utilized throughout the mail service and retail pharmacy marketplace, providing greater flexibility in support of the dispensing of medications at generic reimbursement rates.  (*Id*. ¶ 4).  The National Council for Prescription Drug Programs, Inc. ("NCPDP") -- a not-for-profit American National Standards Institute ("ANSI") Accredited

Standards Development Organization which consists of over 1450 members representing virtually every sector of the pharmacy services industry -- developed and published for the industry standard Dispense As Written ("DAW") codes, and the process of dispensing brand drugs as generics is known and coded as "DAW 5." *(Id.* ¶ 5 & Attach. A). Thus, where a physician prescribes a drug and authorizes substitution, the standard across the retail and mail pharmacy industry (including Caremark's mail order pharmacies) is to utilize the DAW 5 code where the pharmacy uses, as a function of its business operations, the brand product as its generic for that drug, and it is then reimbursed at the generic rate. As the dispensing pharmacy, it can utilize any manufacturers' product to fill a prescription for the generic drug (one of whom might be the branded manufacturer of that drug). The DAW 5 code indicates to the payer that the pharmacy uses the branded item as its generic product. *(Id.* ¶ 6).

Caremark and Morrell & Co. explicitly agreed in their contracts that, when a brand was dispensed as the generic, Caremark would not pay the otherwise contractually agreed upon credit for brand drugs dispensed:

EXHIBIT B

CAREMARK CREDITS

> . . . No rebate shall be credited for any generic Prescription filled at a mail service or retail pharmacy, whether such Prescription is filled with a generic drug or by a brand-name drug dispensed in lieu of a generic drug at the generic drug reimbursement rate . . . .

(1997 PBM Agreement, Ex. B-1; 2000 Proposed PBM Agreement Ex. B-1).

At all times, Morrell & Co. had the option of opting out of situations where a brand would be dispensed as the generic but chose not do so as a component of its plan design. (Saban Aff. ¶ 10). Morrell & Co. expressly retained at all times the sole authority to control and

33

administer its plan. (*See* 1997 PBM Agreement ¶¶ 2(f), 4.b; 2000 Proposed PBM Agreement ¶¶ 2.e, 4.b). Caremark followed the instructions of the prescribing physician and did not dispense the brand as generic if either the physician or participant did not allow it. (*Id*. ¶ 11).

Caremark's PBM Agreements with Morrell & Co. specifically set forth that Caremark had its own rebate contracts with its supplier manufacturers. (PBM Agreements, Ex. B)("Caremark shall hold all contracts or agreements with pharmaceutical manufacturers in connection with any such pharmaceutical manufacturers' rebate programs relating to the products and services covered by this Agreement."). Caremark and Morrell & Co. did not negotiate for a "sharing" or "passing through" of any compensation or rebates that Caremark received from manufacturers. Rather, through its own contracts with drug manufacturers, Caremark earned rebates for its own account across its book of business.

Under these facts, the court finds that the dispensing of brand drugs as the generic product by the mail service pharmacy, and not providing Morrell & Co. with a contractual "credit" for brand drugs dispensed, does not involve the performance of ERISA-regulated fiduciary functions. First, the parties explicitly agreed in their contracts that no credit would be given in such situations. Adherence to contract terms negotiated does not evidence fiduciary discretion. *See Seaway*, 347 F.3d at 618 (finding that, where specific contract terms were bargained for at arm's length, adherence to those terms is not a breach of fiduciary duty); *Schulist*, 717 F.2d 1132 (same).

Second, this issue relates to a plan design decision made by Morrell & Co., immune from fiduciary liability. *See Pegram*, 530 U.S. at 226 (noting that specific "detail of the plan was, of course, a feature that the employer as plan sponsor was free to adopt without any breach of fiduciary duty under ERISA, since an employer's decisions about the content of a plan are not

34

themselves fiduciary acts.").  Likewise, Caremark's execution of the plan design adopted by

Morrell & Co. is immune from fiduciary liability.  *See Mulder*, 432 F. Supp.2d at 459 ("[t]he

Court . . . finds no justification to impose upon PCS ERISA's fiduciary duties where none could

be extended to Oxford"); *Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288, 290 (11th

Cir. 1990)(finding that claims adminstrator was not an ERISA fiduciary where it is simply

performing its functions within a framework of rules established by employer, especially if the

claims processor has not been granted the authority to review benefit denials and make the

ultimate decisions regarding eligibility); *Klosterman v. Western Gen. Mgmt., Inc*., 32 F.3d 1119,

1123-24 (7th Cir. 1994)(same).

Third, where a physician prescribes a drug and authorizes substitution, a pharmacy's use

of the branded product as its generic for that drug is a business decision relating to the operations

of the pharmacy.  No fiduciary concerns are therefore implicated.  *See Pipefitters*, 2007 WL

128773, at *5 ("Discretionary authority does not exist where a party . . . makes business

decisions on its own behalf, outside of its role as plan administrator."); *Eckelkamp v. Beste*, 201

F. Supp.2d 1012, 1023 (E.D. Mo. 2002)(holding that trustees' setting of compensation levels

was a "business decision . . . made in connection with the on-going operation of a business . . .

which does not involve the administration of an ERISA plan or . . . an ERISA plan's assets.").

As one court noted, although such business decisions may affect a plan indirectly, they do not

"implicate fiduciary concerns regarding plan administration or assets.  Business decisions can

still be made for business reasons, notwithstanding their collateral effect on prospective,

contingent employee benefits."  *Id.*  Here, however, Caremark points out that there were no such

"collateral effects" on either Morrell & Co., the JM Plan, or the plan participants because the

branded item was dispensed at the same price and co-pay as the generic for which the

prescription was permitted. Moreover, given that the brand drug was only dispensed so long as the generic that was prescribed was A-Rated to the brand, the participant was receiving the same drug.

The court cannot see how "credits" given or not given to Morrell & Co. under Morrell & Co.'s contracts with Caremark relate to the exercise of discretion over the JM Plan or the Plan's assets. In *Carpenters*, 474 F.3d 463, the Seventh Circuit rejected Carpenters' argument that Caremark controlled plan assets in the form of the portion of rebates paid by drug manufacturers that belongs to Carpenters, finding that Caremark was not collecting rebates from drug manufacturers on behalf of Carpenters, as the contracts clearly specify that Caremark had "an independent contractual duty" to pay rebates to Carpenters. *Id.* at 476 n.6. The Court reasoned: "Caremark was not collecting rebates from drug makers for Carpenters and then passing through a portion; thus Caremark was not controlling assets of the plan but rather was controlling its own assets in making these contractual rebates payments to Caremark." *Id.*

Similarly, the evidence before the court is that Caremark paid the annual rebate to Morrell & Co. with its own funds. Caremark did not pass through the rebates that it received from drug manufacturers. Neither was it required to do so under the PBM Agreement.[9] As such,

---

[9]As Mr. Ure testified:

    Q.    You agree also that you never hired Caremark to go out and negotiate with pharmaceutical manufacturers to provide any rebates from the pharmaceutical manufacturers to your plan?
    A.    That's correct.
    ***
    Q.    You never hired Caremark to go out and collect from
    pharmaceutical manufacturers any rebates or discounts or

the rebates that Caremark received from drug manufacturers were not plan assets; they were Caremark's assets. Caremark did not have, nor did it breach, any fiduciary duty in negotiating and retaining such rebates for itself. See *Carpenters*, 474 F.3d 476, n.6 ("Caremark was not controlling assets of the plan but rather was controlling its own assets in making these contractual rebate payments to Carpenters."). Even in *Mulder*, where the PBM negotiations with drug manufacturers *did* affect the amount of rebates the plan sponsor received because the contract provided for pass through rebates, the court held that the PBM negotiations with drug manufacturers did not constitute discretionary authority over the plan. 432 F. Supp.2d at 459-60. In rejecting the plaintiff's theory that the rebates PCS contracted for were for the benefit of both Oxford and PCS and, "[a]s such, PCS had and exercised discretionary authority and control over negotiating with drug manufacturers, formulary management and drug-switching programs," the court stated that "[t]his argument . . . assumes, rather than proves, that the rebates were plan assets." *Id.* at 459. The court held that PCS did not acquire fiduciary status or have discretionary authority over plan assets "simply by contracting to receive its compensation for services through drug rebates." *Id.* The court reasoned: "Plaintiff assumes that PCS had discretionary authority or exercised discretionary authority with regard to the plan simply because PCS acted as a middleman between drug manufacturers and Oxford. [However,]

---

interest or fees of any other types of compensation that they would then be forwarded on to John Morrell, did you?

A.      No, I did not.

Q.      You never negotiated to share in any compensation Caremark may have received from pharmaceutical manufacturers, did you?

A.      No, I did not.

(Ure Dep. 226-27). Again, this testimony appears to have been elicited on cross-examination of the plaintiff's witness by defense counsel. *See supra* note 8. There were no objections by counsel during the deposition to this particular testimony.

Plaintiff fails to show how PCS had actual control or authority over the Oxford plan or plan assets." *Id.* at 459.

Even if the challenged activity were subject to ERISA's regulatory framework, Caremark still prevails because it lacked final decision-making authority or responsibility for this activity. Because Morrell & Co. retained at all times the sole authority to control and administer its plan, Morrell & Co. had the option of opting out of situations where a brand would be dispensed as a generic. It chose not to do so. *See Carpenters*, 474 F.3d at 477 (holding that Caremark could not be an ERISA fiduciary because Carpenters retained for itself the final authority to control and administer its plan). Additionally, the dispensing of a brand as a generic was always subject to the approval of both the physician and the participant. Accordingly, the court finds that Caremark was not an ERISA fiduciary related to this activity and is entitled to summary judgment on this theory. *See* 29 C.F.R. § 2509.75-8 Q-D-2; *Mulder*, 432 F. Supp.2d at 461.

### D. *Caremark served as an ERISA fiduciary when it exercised fiduciary discretion in managing the formulary and deciding when to switch members' prescriptions to formulary-preferred prescriptions.*

Caremark develops its formularies and preferred drug lists for its own account and makes them available to prospective plan sponsor clients for adoption if they so choose. Caremark does not develop these products and services with regard to any particular sponsor or with reference to the "management" of any specific plan. Caremark's senior vice president of industry relations and analysis testified that the purpose of the formulary program "is to promote and utilize the preferred drugs that are represented on that list as well as the ability to contact prescribers, as appropriate, to gain approval for substitution of formulary drugs as part of the program." (Saban Dep. at 99).

Caremark's clients such as Morrell & Co. are not required to adopt Caremark's standard

38

formulary.  Morrell & Co. elected to use Caremark's standard formulary but later  demanded and utilized a customized drug list that was different from Caremark's standard formulary for a portion of its plans.  Morrell & Co. explored on various occasions utilizing other customized formularies for other plans, ultimately choosing not to implement them due to the increased costs.   For a portion of the plans, Morrell & Co. and Caremark agreed that modifications to the formulary for the Plan would occur on an annual basis rather than quarterly. (Ure Dep. Part. 2 at 364).

Pursuant to the terms of the parties' agreements, at all times Morrell & Co. retained exclusive control and authority over the JM Plan and its administration, including with respect to its formulary(ies) and associated programs.  (*See* 1997 PBM Agreement ¶¶ 2.f, 4.b; 2000 Proposed PBM Agreement ¶¶ 2.e, 4.b).[10]  In correspondence by Morrell & Co. to Caremark, Morrell & Co. repeatedly instructed Caremark as to the formulary services it desired and drugs that would be covered under its Plan.  (See Docket No. 144, Ex. 6 wherein Mr. Ure writes "NO OTHER PHARMACEUTICALS WILL BE COVERED WITHOUT WRITTEN AUTHORIZATION FROM [Morrell & Co. benefits employee] LAVONNE OR MYSELF.");  Ex. 7 (Morrell & Co. approving adoption of custom formulary it had requested); Ex. 8 (Morrell & Co. stating that it does not "agree with using the 'Caremark' formulary," and that Morrell & Co. "DETERMINES THE JM FORMULARY.")   Saban testified that this series of communications "show[ed] that the John Morrell plan was, in fact, exercising control over the formulary that they wanted adopted for the formulary plan."  (Saban Dep. at 273).

_____

[10]Morrell & Co. corporate benefits director Wayne Ure testified to the contrary in his January 2007 deposition (Ure Dep. Part 2 at 361-62), valid objections to which were made.  Additionally, in a letter dated October 30, 1999, Mr. Ure indicated that Morrell & Co. retained control of the content of the formulary.  (*See* Docket No. 144, Ex. 6).

39

An independent group of clinical experts comprising a pharmacy and therapeutics committee -- not Caremark -- had the sole responsibility under the contract to review and approve the drugs listed on Caremark's standard formulary as well as any clinical interventions. (Saban Dep. at 215-18).

Based on the evidence presented, the court finds that Caremark's formulary design and management activities with respect to its proprietary formularies are not fiduciary in nature. First, Caremark developed its proprietary formularies for its own account, without reference to any client or plan, and then made such formularies available to prospective clients for adoption if they so desired. Under *Pegram*, a service provider performing such tasks does not become an ERISA fiduciary "merely because it administers or exercises discretionary authority over its own . . . business." 530 U.S. at 227; *Pipefitters*, 2007 WL 128773, at *5 ("Discretionary authority does not exist where a party . . . makes business decisions on its own behalf, outside of its role as plan administrator."); *Mulder*, 432 F. Supp.2d 450, 458 ("[T]he fact that PCS operated independently in negotiating contracts with drug manufacturers does not make PCS an ERISA fiduciary.").

Second, when contracting with Caremark, it was Morrell & Co.'s decision to adopt Caremark's formulary program as a desired feature of certain portions of its plan for certain time frames (for others, Morrell & Co. implemented custom formularies). *See Carpenters*, 474 F.3d at 477 ("Carpenters adopted Caremark's pre-existing formulary as a feature of its plan. Under Pegram, the formulary program and drug-switching program were plan features not subject to fiduciary standards."); *Mulder*, 432 F. Supp.2d 450, 458 ("PCS contracted with drug manufacturers but it was for Oxford to decide if it wanted to include those drugs on its PDL.").

Third, at all times pursuant to the terms of the contract negotiated at arm's length by the

40

parties, Morrell & Co. retained exclusive control and authority over the JM Plan and its administration, including with respect to its formulary(ies). The plaintiff in *Carpenters* made the same argument Moeckel makes here: that, although its plan sponsor chose to adopt Caremark's standard formulary, Caremark had "'complete control' over the ongoing content of the formulary and the drug-switching program," and was thus an ERISA fiduciary. 474 F.3d at 477. The Carpenters plaintiffs claimed, like Moeckel here, that Caremark's formulary "is not a static list; Caremark adds and removes drugs from the list." *Id.* at 476. The Seventh Circuit Court of Appeals rejected that argument, finding that, in each of the relevant PBM service contracts, Carpenters "retained the 'sole authority to control and administer the Plan.'" "Given that Carpenters retained *sole* authority to control and administer the plan," the Court reasoned, "Carpenters was the final arbiter of the content of the formulary and any drug-switching decisions." *Id.* (emphasis in original). The Court noted that "[t]he express language of the contracts contradicts this characterization of Caremark's authority over these programs" and, with respect to "any ongoing changes to formulary or specific decisions by Caremark in adminstering the drug-switching program, Carpenters retained for itself the final authority to adminster these programs on an ongoing basis[;]" thus, "Caremark was . . . not a fiduciary for this purpose." *Id.*

The court finds that the same reasoning applies here. Morrell & Co. expressly elected to adopt Caremark's standard formulary for portions of its plans. However, the contracts between the parties made clear -- as in *Carpenters* -- that the plan sponsor (here, Morrell & Co.) retained "sole authority to control and administer the Plan." (*See* 1997 PBM Agreement ¶ 4.b.; 2000 Proposed PBM Agreement ¶ 4.b.) There is undisputed evidence before the court that Morrell & Co. exercised this authority on numerous occasions. Thus, like the *Carpenters* court, this court

finds that Caremark lacked the ultimate discretionary authority to administer the formulary and drug-switching programs and therefore was not an ERISA fiduciary for these purposes. *See* 474 F.3d at 477; *see also Mulder*, 432 F. Supp.2d 450, 455-59 (responding to similar argument, court found that plan sponsor's "decision to adopt portions of the PCS PDL was a plan design decision regarding the makeup of the plan . . . [and], therefore, finds no justification to impose upon PCS ERISA's fiduciary duties where none could be extended to Oxford.") .

As to the plaintiff's assertion that it is Caremark that decides when, how, and whether a member's prescription will be switched (Docket No. 123 at 24), under the therapeutic interchange program, Caremark only implemented interchange criteria selected and approved by Morrell & Co. as part of the program it selected. (*See* Saban Dep. Part 1 at 215-219, Part 2 at 277-78). As Mr. Saban explained, the program selected by Morrell & Co. "enhance[d] John Morrell's ability to arrange and provide medical treatment in a cost effective manner for its participants" because "[t]he program is designed to prefer drugs that are either clinically superior or that produce a cost savings to the member and/or the client." (*Id.* Part 2 at 277-78) Morrell & Co. retained complete authority, and the right of final approval, of the JM Plan's formulary and therapeutic interchange programs at all times. The final decision regarding which drug to prescribe, and thus whether intervention could occur, always rested with the participant's medical provider. (PBM Agreements, Ex. C; Saban Dep. Part 2 at 278 (Q. "With respect to these intervention programs, who has the final authority to decide as to whether any intervention can ever occur for a given participant?" A: The physician does." Q. And what do you understand is the basis or reasons as to why physicians or doctors approve these interventions? A. The approval is based on their knowledge of the member's clinical history and clinical position as well as the physician's clinical medical knowledge. Q. Can those interventions ever

42

occur without the physician's approval?  A.  No, they cannot.")).  As such, Caremark cannot be an ERISA fiduciary as a matter of law in this regard.  *See* 29 C.F.R. § 2509.75-8 Q-D-2; *Group Hospitalization & Med. Servs.*, 295 F. Supp. 2d at 464 (holding that PBM defendants' alleged drug switching activities were "actions that defendants took in their ministerial capacity while they managed plaintiff's plans according to plaintiff's specifications").

For the reasons explained above, the court will deny the plaintiff's motion for partial summary judgment.   The court finds that Caremark was not acting as an ERISA fiduciary when performing the five distinct acts of plan management alleged by the plaintiff.  *See  Pharm. Care Mgmt. Ass'n*, 429 F.3d at 300-01, 305 (considering *sua sponte* the precise issue of whether PBMs act as ERISA fiduciaries in connection with services they provide to their customers and concluding that PBMs do not exercise "discretionary authority or control in the management and administration of the plan," and therefore, are not fiduciaries under ERISA.  "As such," the court held, "they are outside of the 'intricate web of relationships among the principal players in the ERISA scenario' [and,] ERISA . . . is not designed to regulate or afford remedies against entities that provide services to plans.").

## C.      *Caremark seeks judgment as a matter of law on theories of ERISA fiduciary duty not raised in the plaintiff's motion.*

In its cross-motion,  Caremark seeks judgment on certain additional breach of ERISA fiduciary duty theories alleged by the plaintiff in the complaint but not raised in the plaintiff's motion for partial summary judgment: claims processing, interest on the "float," AWP conspiracy, sale of plan participant information, and control over plan assets.   In response to Caremark's motion for partial summary judgment, the plaintiff makes no arguments in opposition to Caremark's motion concerning the plaintiff's theories relating to claims

43

processing, interest on the "float," AWP conspiracy, and sale of plan participant information. The court interprets the plaintiff's failure to respond as a concession that the plaintiff cannot rebut Caremark's arguments with respect to these theories. Nevertheless, the court will address these claims below.

### 1. Claims processing

The PBM Agreements provided that Caremark would provide such ministerial services as claims processing, filling prescriptions, computerized drug interaction monitoring, customer service, distributing explanation of benefits letters, and access to its mail service pharmacy and network of retail pharmacies "in accordance with the Plan design features communicated by Client [Morrell & Co] to Caremark." (1997 PBM Agreement ¶ 2; 2000 Proposed PBM Agreement ¶ 2) (emphasis added). These acts and services do not involve discretionary authority or control over the management or administration of the JM Plan or its assets. *See Confer v. Custom Eng'g Co.*, 952 F.2d 34, 39 (3d Cir. 1991) (finding no discretionary authority where defendant plan supervisor's "obligation was to follow the written plan instrument and follow instructions of the [plan] administrator"); *Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288, 290 (11th Cir. 1990) (holding that "[a]n insurance company does not become an ERISA 'fiduciary' simply by performing administrative functions and claims processing within a framework of rules established by an employer . . . especially if . . . the claims processor has not been granted the authority to review benefits denials and make the ultimate decisions regarding eligibility").

Even the claims processing function that Caremark performed under the PBM Agreements was devoid of such discretion because Morrell & Co., as the plan administrator, retained exclusive authority over eligibility determinations and appeals of denied claims. (*See*

PBM Agreements ¶ 4.b.)("Client [Morrell & Co.] has the sole right to resolve disputed claims and shall promptly inform Caremark of such resolution.")); *see also Mulder*, 432 F. Supp. 2d 450, 456 ("The design, implementation and administration of [the PBM]'s claims processing services alone does not constitute the type of decision-making authority that would render [a PBM] an ERISA fiduciary."). The court finds that providing and maintaining its system for managing Morrell & Co.'s drug benefit claims does not elevate Caremark to an ERISA fiduciary.

### 2. Retaining interest on the float

Under the PBM agreement, Caremark is obligated to pay the contracted-for annual rebate to Morrell & Co. "within ninety (90) days of each calendar year." (1997 PBM Agreement, Ex. B). The plaintiff claims in his complaint that Caremark somehow possessed and breached fiduciary duties by generating and retaining interest on the "float" prior to disbursement of rebates to the JM Plan. There are several problems with this theory. First, the plaintiff is putting the cart before the horse. Morrell & Co. did not negotiate or contract for a share of the rebates. The rebates that Caremark receives from drug manufacturers belong to Caremark, not to the Plan. Thus, any interest that Caremark earns on such rebates is an asset of Caremark, not of Morrell & Co. or the JM Plan. Under the PBM agreements, Caremark has no obligation to pass on interest that it earns on its own money to the JM Plan.

Second, the plaintiff does not even complain that Caremark failed to pay the annual rebate to Morrell & Co. when it was due. Even if the plaintiff made that claim, however, as explained above, the plaintiff's claim would be a breach of contract claim--not a breach of fiduciary duty claim--held by Morrell & Co. as the other party to the PBM agreements. Caremark cannot be held liable for breach of fiduciary duty for retaining interest earned on its

45

own money and adhering to the specific contract terms. *See Fechter v. Conn. Gen. Life Ins. Co.*, 800 F. Supp. 182, 199-200 (E.D. Pa. 1992)("[I]f a specific contractual term is bargained for at arm's length, adherence to that term . . . is not a breach of fiduciary duty."). Thus, the defendant is entitled to judgment as a matter of law on this theory.

### 3. Inflating the AWP in violation of OBRA

Moeckel claims that Caremark possessed and breached an ERISA fiduciary duty by conspiring with unidentified drug manufacturers to artificially inflate the AWP of unspecified drugs in violation of the Medicaid "best pricing" rules in the Omnibus Reconciliation Act of 1990 ("OBRA"). (*See* Compl. ¶¶ 35-37; *see also* ¶¶ 6, 57(f), 67(a), and 72(f)). The defendant contends that the plaintiff has no evidence with which to carry his burden of proof and that this claim must be dismissed.

Under ERISA, one can only be a fiduciary to the extent one exercises discretion with respect to the "management of [a] plan" or with respect to the "disposition of [said plan's] assets." 29 U.S.C. § 1002(21)(A). Moeckel's allegation that "Caremark . . . conspires with manufacturers to inflate the AWP and . . . deceive the federal government" (Compl. ¶ 37) does not allege that Caremark exercised any discretion with respect to the management of the JM Plan or with respect to the disposition of JM Plan assets. Thus, defendant argues, and the court agrees, that such allegations do not support any fiduciary duty being owed by Caremark to the JM Plan. As such, this claim fails as a matter of law. *See* 29 U.S.C. § 1002(21)(A).

In addition, it is doubtful that Moeckel has standing to assert such OBRA claims in any event. OBRA's purpose is to provide Medicaid beneficiaries access to the same drugs as private patients and to reduce Medicaid expenditures. *See Budget Reconciliation Act*, H.R. Rep. No. 101-881, at 96-98 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2108-10. The sole remedy that

46

OBRA provides for a violation of the law is a fine against the drug manufacturer, which inures to the benefit of the Government and not to private parties. *See* 42 U.S.C. §§ 1396r-8(b)(3)(B) to (C)(ii). Thus, OBRA does not afford any rights whatsoever to private health plan members, such as Moeckel alleges to be, and was not designated to protect his interests. *See e.g.*, *Provident Life & Accident Ins. Co. v. United States,* 740 F. Supp. 492, 495 (E.D. Tenn. 1990)(emphasis added)(noting that OBRA "has given rise to suits *by the Government* against insurance companies to recover Medicare overpayments allegedly due under the Medicare Secondary Payer provisions"). The court finds that Moeckel lacks Article III standing with respect to his OBRA claim, as he cannot show that he "suffered an 'invasion of a legally protected interest'" under OBRA. *See Raines v. Byrd*, 521 U.S. 811, 819 (1997)(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

### 4. Selling plan participant and beneficiary information

The defendant also seeks judgment as a matter of law on the plaintiff's theory that Caremark breached ERISA fiduciary duties by selling information to third parties concerning Plan participants and beneficiaries. (Compl. ¶¶ 41(H), 49(H), 62(f), 67(c), and 72(h)). Caremark PBM agreements with Morrell & Co. expressly provided that "data may be combined and used by Caremark in preparing statistical analysis reports or for other business purposes that may be made available to others, in which event information pertaining to Covered Members shall be identifiable." (1997 PBM Agreement ¶ 2.g; 2000 Proposed PBM Agreement ¶ 2.f). Thus, Morrell & Co. agreed to allow Caremark to use such data for Caremark's business purposes. This claim, too, must fail.

### 5. Controlling plan assets

ERISA defines "fiduciary" to include, *inter alia*, any person who exerts "any authority or

47

control respecting management or disposition of plan assets."  29 U.S.C. § 1002(21)(A)(i).

Courts construe the term "plan asset" broadly to effectuate Congress' overriding concern of the

protection of plan participants and beneficiaries.  *Grindstaff v. Green*, 133 F.3d 416, 432 (6th Cir.

1998).  While the plaintiff alleges in his complaint that Caremark is a fiduciary due to its control

over the disposition of plan assets, the plaintiff does not presently seek partial summary

judgment based on Caremark's control over plan assets.  (Docket No. 123 at 12 n.20).  However,

in its motion for partial summary judgment, Caremark seeks a ruling that it does not control the

disposition of plan assets and cannot be an ERISA fiduciary in that regard.

A fiduciary relationship does not exist where an administrator "performs purely

ministerial functions such as processing claims, applying plan eligibility rules, communicating

with employees, and calculating benefits."  *Pipefitters*, 2007 WL 128773, at *3 (quotation

omitted).  "Fiduciary authority must amount to more than 'mere possession, or custody over the

plan['s] assets."  *Id*.  (citing *Briscoe*, 444 F.3d at 494).  In addition, fiduciary status under ERISA

does not apply where "parties enter into a contract term at arm's length and where the term

confers on one party the . . . right to retain funds as compensation for services rendered with

respect to an ERISA plan."  *Id*. (quoting *Seaway*, 347 F.3d 610, 619)).  "Fiduciary status does

not extend to an administrator that exercises authority solely over funds that 'belonged to [itself]

and not to the plan.'"  *Id.* (quoting *Seaway*, 347 F.3d at 618).  Therefore, Moeckel must prove

that Caremark exercised any authority or control over plan assets, and that it performed more

than a mere ministerially or contractually compelled function.

Caremark argues that there is no evidence that it had any plan assets under its control.

According to Caremark, it could not have exercised control over the assets of the JM plan since

Caremark at all times used its own assets, not plan assets, to pay its retail pharmacy and drug

manufacturer suppliers. The plaintiff submits that Morrell & Co's director of corporate benefits testified that Morrell & Co. uses plan assets when it pays prescription claims and discharges the obligation of the JM Plan to cover the cost of an employee prescription. (Ure Dep. Part 2 at 340-41). The plaintiff further submits that, because Caremark had the discretion to ask retail pharmacies not to bill it for drugs until Caremark received payment from Morrell & Co., Caremark was exercising control over JM plan assets.

The court finds the plaintiff's theory regarding control over plan assets to be vague and unspecific. The court's understanding of the theory is as follows: Because Morrell & Co., a self-funded employee benefit plan, paid Caremark invoices for drugs with its own funds that contain JM plan assets or are comingled with JM plan assets, and because Caremark in some instances exercised discretion in the amounts billed to Morrell & Co. (and Morrell & Co. used, at least in part, plan assets to pay those invoices) and in the savings, rebates, and the like passed through to Morrell & Co. (such that the amount of money in the JM Plan is reduced or increased by the withholding or provision of these savings, rebates, and the like), Caremark is exercising control over JM plan assets. The plaintiff's theory assumes much and goes too far. The evidence adduced by the plaintiff in support of this theory shows that many of Caremark's actions complained of by the plaintiff were contractually compelled as a result of an arms' length negotiated agreement between Caremark and Morrell & Co. Even assuming that the evidence adduced by the plaintiff sufficiently supported his contention that plan assets were used to pay Caremark, Caremark exercised no control or authority over such assets; Caremark would have simply received and possessed them. Under *Pipefitters*, 2007 WL 128773, at *3 , that is insufficient to convey fiduciary status.

The JM Plan had no contractual relationship or obligation to Caremark. Caremark's

49

relationship at all times was solely with Morrell & Co. Therefore, when Morrell & Co. paid Caremark's invoices, it was not discharging the obligations of the JM Plan. Rather, it was discharging Morrell & Co.'s own contractual obligations to Caremark per the terms of the contracts between the parties. *See Bickley*, 361 F. Supp.2d at 1333 ("the court reads the PBM Agreement to provide that Caremark is not given (nor does it have control over) Plan money.").

If the court accepted the plaintiff's theory as pleaded, it seems that the court would be holding that any PBM that deals with a self-funded employee benefits plan must, as a matter of law, be an ERISA fiduciary. There is no precedent for such a holding. *See Bickley*, 361 F. Supp.2d 1317, 1332-33 ("Creation of ERISA fiduciary status . . . is not something to be undertaken lightly.").

## VII. <u>Conclusion</u>

"[T]he linchpin of fiduciary status under ERISA is discretion." *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 233 (3d. Cir. 1994). Analyzing each of Caremark's relevant business practices, the court finds that Caremark did not exercise discretionary authority or control over the management of the JM Plan. As explained by the court herein, the five activities of which the plaintiff complains were outside the scope of ERISA's regulatory framework. The activities relate to the basic administration of Caremark's own business, which is non-fiduciary in nature. Likewise, Morrell & Co.'s contracting decisions as to what, and how, to pay Caremark for the services rendered under the PBM Agreements, as well as what formulary(ies) and drug interchange programs to adopt for its plan relate to plan design decisions, which are also non-fiduciary in nature. Based on the facts presented, Caremark did not exercise any authority or control over plan assets. The plaintiff's theories conflate Morrell & Co.'s service contracts with Caremark with the JM Plan documents. In sum, the court does not

50

find that Caremark is an ERISA fiduciary under the parties' PBM agreements.  Moeckel may not sustain claims against Caremark for breach of fiduciary duty.

For the foregoing reasons, the plaintiff's motion for partial summary judgment (Docket No. 120) will be denied, and the defendant's motion for partial summary judgment (Docket No. 128) will be granted.  The plaintiff's request for a hearing on his motion (Docket No. 121) will be denied.   The plaintiff's motion "to unseal plaintiff's memorandum of law in support of partial summary judgment or to refile this brief in the public record with redaction" (Docket No. 134) will be granted, insofar as the plaintiff may refile the brief in the public record with a redaction of the pricing figures.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

Case 3:04-cv-00633   Document 166   Filed 11/13/07   Page 51 of 51 PageID #: 2490